**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:11-cv-000179-MR**

THOMAS J. BERITELLI and )
SHARON A. BERITELLI, )
                                 )
           **Plaintiffs,** )
                                   )
      **vs.** )           **O R D E R**
                                   )
                                   )
WELLS FARGO BANK, N.A. and )
KERRY LANGLEY, )
                                   )
           **Defendants.** )
_____ )

        **THIS MATTER** is before the Court on the Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss [Doc. 94].

**I.     PROCEDURAL BACKGROUND**

        This civil action was brought originally by 50 purchasers of subdivision lots in a failed real estate development known as the River Rock subdivision in Jackson County, North Carolina ("River Rock"). [Amended Complaint, Doc. 39 at ¶1]. These purchasers brought suit against Wells Fargo Bank, N.A., the successor in interest to Wachovia Bank, N.A. ("Wells Fargo" or "the Bank"), Elizabeth Madden, Andrea

Murphy, Kerry Langley, Nancy Decker, and Marilyn McCoy Woods, asserting claims for violations of the Interstate Land Sales Act, 15 U.S.C. § 1703(a)(2) ("ILSA"), violations of the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("Chapter 75"), negligent misrepresentation, negligence, and fraud, arising from the Defendants' alleged involvement in a scheme to artificially inflate the value of the lots in River Rock. [Id.].

On June 6, 2012, the Court entered an Order questioning whether all of the Plaintiffs were properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure and ordering the parties to show cause why the Plaintiffs should not be severed in this case and why the purchasers of each individual lot should not be required to prosecute their cases separately. [Doc. 77]. After receiving the responses of the parties, the Court ordered the severance of all of the Plaintiffs, and directed the Plaintiffs to file separate complaints setting forth their individual causes of action. [Doc. 83].

On August 20, 2012, the Plaintiffs Thomas J. Beritelli and Sharon A. Beritelli ("Beritellis") filed their Amended Complaint in compliance with the Court's Order, bringing suit against Defendants Wells Fargo and Kerry

Langley ("Langley").[1]  [Doc. 85].  Wells Fargo now moves to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. 94].

## II.    STANDARD OF REVIEW

In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6), the Court is guided by the Supreme Court's instructions in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) and  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). As the Fourth Circuit has noted, "those decisions require that complaints in civil actions be alleged with greater specificity than previously was required." <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678.

In reviewing the complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal

---

[1]On October 5, 2012, Defendant Langley filed a notice with this Court, indicating that he had filed for bankruptcy.  [Doc. 97].  Accordingly, this action has been stayed as to this Defendant.  [<u>See</u> Doc. 102].

3

conclusions." Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." Walters, 684 F.3d at 439.

To survive a Rule 12(b)(6) motion, "a complaint must state a 'plausible claim for relief.'" Id. (quoting Iqbal, 556 U.S. at 678). Determining whether a complaint states a plausible claim for relief is "a context-specific task," Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009), which requires the Court to assess whether the factual allegations of the complaint are sufficient "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555. As the Fourth Circuit has recently explained:

> To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

4

## III.    FACTUAL BACKGROUND

Taking the well-pled factual allegations[2] of the Amended Complaint as true, the following is a summary of the relevant facts.

The River Rock subdivision was intended to be a luxury real estate development with numerous amenities, including a Phil Mickelson golf course, near Glenville, North Carolina.   The developer was Legasus of North Carolina, LLC.   [Amended Complaint, Doc. 85 at ¶1].   The Beritellis purchased Lot 94 (the "Beritelli Lot") in the River Rock subdivision on July 7, 2006 for $349,900.   [Id. at ¶74].   At the time that the Beritellis acquired their lot in the development, there were no paved roads to serve those lots and no sewer, water service lines or water wells, no sewage system and no electricity provided.   [Id.].

It is alleged that Wachovia Bank had extensive involvement in the development, marketing and sale of lots in the River Rock subdivision by participating in off-site sales presentations with Legasus to sell lots in the River Rock subdivision, including the Summer Sail event at Lake Glenville

---

[2] In reciting the relevant factual allegations, the Court has disregarded all "bare legal conclusions" asserted in the Amended Complaint, see Aziz, 658 F.3d at 391, as well as "[t]he mere recital of elements of a cause of action," see Walters, 684 F.3d at 439. Additionally, where the Plaintiffs allege based only upon "information and belief," such allegations shall be so noted.

on June 10, 2006 and the Grand Opening sales event in July of 2006 at the Mansion at Lake Glenville.  [Id. at ¶¶63, 97].

It is further alleged that the Bank held itself out to be a significant financial backer of the River Rock subdivision.  [Id. at ¶97].  For example, the Bank designed a loan program to be offered to the purchasers of lots in River Rock whereby the Bank would finance between ninety and one hundred percent of the purchase price of the lot through short-term one to five year loans at high interest rates, with the majority of the loan terms being for two years.  [Id. at ¶11].  The Bank's lot loan program required borrowers to make a down payment of between five and ten percent of the lot purchase price and that down payment was transferred by Legasus into an account at the Bank at the closing of each lot purchase to be used to pay the first eighteen or so interest payments on the Bank's loan to each of the Plaintiffs.  [Id. at ¶12].  The Bank developed its loan program for River Rock knowing that the potential purchasers of lots in River Rock were primarily investors from states other than North Carolina who were planning to sell the lots that they purchased before the expiration of their loan term. [Id. at ¶13].  The Bank also knew that many of its eventual borrowers who purchased lots in River Rock had never visited River Rock and had never seen the lots that they were purchasing.  [Id. at ¶24].

6

The Bank designed its loan program at River Rock so that the potential purchasers of lots in River Rock would not have to make payments on their loans for the first approximately eighteen months of the loan term because the Bank knew that this would induce investors to enter into loan agreements with the Bank and purchase lots in River Rock.  [Id. at ¶14].

The Bank provided potential lot purchasers at River Rock with a document entitled, "A Special Offer to Our Friends at River Rock."  In this document, the Bank stated that this was "Wachovia's Development Lot Loan Program" and that it was for, "clients purchasing or refinancing lots for future development in subdivisions specifically approved by Wachovia." [Id. at ¶18].  "Upon information and belief," the Plaintiffs allege that the Bank "worked with Legasus" to develop the loan program described in this document.  [Id. at ¶17].

In this "Special Offer," the Bank highlighted its one, three and five year interest-only balloon loan options. In addition, the Bank asserted that it had an "85% standard Loan-to-Value Ratio with up to 100% LTV Ratio available with qualified asset documentation."  [Id. at ¶21].   The Bank promoted its loan program to potential borrowers without explaining to those borrowers the risks associated with such a program or considering

7

the ability of borrowers to make mortgage payments beyond the loan term. [Id. at ¶16].

The Beritellis allege that the Bank, particularly through its employee, Kerry Langley, made numerous false statements to induce the Plaintiffs to enter into a loan agreement with the Bank and purchase a lot in River Rock.[3]  [Id. at ¶4].  For example, it is alleged that from 2006 through 2009, the Bank and its employees promoted River Rock as a luxury resort that would have significant amenities, but that the Bank and its employees knew that Legasus was not constructing the infrastructure and amenities that it had promised to the purchasers of lots in River Rock.  [Id. at ¶¶5, 60]. Nevertheless, the Bank and its employees still made numerous representations to the Plaintiffs regarding the quality of Legasus and the value of lots in the River Rock subdivision and continued to loan money to the Plaintiffs and other lot purchasers to purchase lots in the subdivision. [Id. at ¶¶61, 62].

During the loan application process, Langley told lot purchasers at River Rock to indicate on their loan applications that they were purchasing

---

[3] It is alleged that Langley was a Wachovia loan officer as well as a Certified Financial Planner who provided investment advice to the Beritellis and other purchasers of lots in River Rock, while also providing those individuals with loans to purchase those lots.  [Id. at ¶66].

8

the lots as second homes, even though he knew that they were purchasing the lots as investments. [Id. at ¶64]. Langley emphasized the speed of closing to borrowers and often set closing dates before loan applications had ever been submitted by borrowers. [Id. at ¶65].

It is specifically alleged that during the loan application process and via interstate telephone communications from Langley's office in North Carolina to Thomas J. Beritelli in Wyckoff, New Jersey, Langley made the following representations:

- that River Rock was a "hot property" in a strong market area and that the area around River Rock was established with many resort-like communities [Id. at ¶75];

- that River Rock was a "good investment" and that Beritelli "would see a profit when he sold his lot" [Id. at ¶77];

- that River Rock sales had "started out strong" and that Legasus "had reservations for future lot releases" [Id.];

- that Legasus "would sell re-sales along with [its] own inventory and that those lots will be higher priced, so Beritelli could easily match the developer prices and sell the Beritelli Lot during one of the sale event weekends and that lots always sold out at those events" [Id. at ¶78];

9

- that "it was a good plan to hold onto the Beritelli Lot and let the prices go up while the project progressed" [Id. at ¶79];

- that Beritelli should "not rush to sell the lot and that the longer he held the lot, the more money he would likely make" [Id.];

- that the River Rock lot purchase was a unique investment opportunity," as it required only 10% down and no cash out of pocket for almost two years while the lot appreciated [Id. at ¶80];

- that it was a "great deal" for everyone who had the opportunity to buy a lot at this early stage in the development of the project [Id.]; and

- that the developer had hired "first class contractors" to develop River Rock [Id.].

The Beritellis allege, "[u]pon information and belief," that the Bank and its employees hand selected appraisers to conduct appraisals of lots at River Rock whom they knew that they could persuade to provide inflated values in their appraisals to reach pre-determined values of lots based on each buyer's contract purchase price. [Id. at ¶25]. The Bank hired appraiser Marilyn McCoy Woods ("Woods") to conduct an appraisal of the Beritelli Lot in River Rock because it knew that she would provide the values necessary to close the Bank's loan transactions to the Plaintiffs and thus the sale of the subject lot to Plaintiffs. [Id. at ¶6].

10

Woods conducted the appraisal of the Beritelli Lot on May 10, 2006, appraising the property at $350,000. [Id. at ¶88]. Woods, however, failed to use lots outside of the River Rock subdivision as comparables to determine its value.[4] She also failed to account for the fact that there was insufficient infrastructure and utilities in the River Rock subdivision to support the value placed on the Lot. [Id. at ¶87].

On May 18, 2006, Wachovia Mortgage Corporation Appraisal Review Specialist Benny A. Templeton sent an e-mail communication to Langley containing his internal review of Woods's appraisal of the Beritelli Lot. In his e-mail, Templeton noted that Woods was on the Wachovia Mortgage Corporation Watch List at that time. Templeton further stated that while review of the appraisal "revealed several deficiencies," he concluded that "none of them appear to adversely impact the original EMV (estimate of market value) beyond acceptable corporate risk tolerance boundaries." [Id. at ¶84]. Templeton further noted in his review that no public data was obtainable in the subject's market area from sources available to the

_____

[4]It is alleged in the Amended Complaint that from August of 2005 through December of 2005, the Jackson County, North Carolina average raw land sales price for lots between zero and four acres was $136,837, with most of these lots being in established communities with amenities and infrastructure. [Id. at ¶27]. During the same time period, the average sale price for raw lots with no amenities and infrastructure in River Rock was $313,276, an average of 2.27 times the sale price of raw lots sold in Jackson County. [Id. at ¶¶28, 29].

11

reviewer and that there was insufficient market evidence available to revise and/or defeat the appraisal. Templeton nevertheless concluded that, "it is my opinion that the appraisal overall appears to be adequately developed, reported, market data relevant and a reasonable collateral range is estimated to be $315,000 to $350,000 with a most probable of $350,000." [Id. at ¶85].

The Beritellis paid Woods $250.00 for the appraisal. They also paid Wachovia Mortgage Corporation a $300.00 appraisal fee. [Id. at ¶89]. The Beritellis, however, did not receive a copy of the appraisal prior to their purchase of the property. [Id. at ¶90]. The Plaintiffs allege, "[u]pon information and belief," that the Bank did not provide them with a copy of the appraisal because the Bank knew that if the Beritellis were aware of the information in the appraisal, they would not have purchased the property. [Id. at ¶91].[5]

It is alleged that the Bank's use of inflated appraisals caused higher sales prices for lots in the River Rock subdivision which generated higher interest payments and fees to the Bank on loans that it made in the River Rock subdivision, as well as higher commissions to its loan officers, than it

---

[5] The Beritellis ultimately requested and received a copy of the appraisal in December 2008, nearly two years after the purchase of their property. [Id. at ¶83].

would have yielded if the lots in the River Rock subdivision would have been appraised at their true values. [Id. at ¶¶30, 31]. The inflated appraisals also artificially created the impression that lot prices were continuing to increase in River Rock and thus induced investors to continue to purchase lots in River Rock. [Id. at ¶32].

Wachovia Bank worked with Legasus to facilitate the sale of over $15,000,000.00 worth of lots in River Rock from January 1, 2005 through December 31, 2007. [Id. at ¶69]. Wachovia Bank issued at least 34 loans to lot purchasers in River Rock for a total loan amount of $10,169,375.55 with loan origination fees on those loans exceeding one hundred thousand dollars. In addition, at the closing of these loans Wachovia Bank received guaranteed interest payments exceeding one million dollars in the form of the deposits from which the bank would draw the monthly payments. [Id. at ¶68].

With respect to the Beritellis' purchase, Legasus paid the Bank $31,893.13 in seller-paid interest payments at the settlement of the Beritelli Lot. [Id. at ¶81]. The Beritellis paid the Bank a commitment fee of $500.00, an application fee of $60.00, and a document transmission fee of $25.00 at settlement. [Id. at ¶82].

13

It is alleged that Wachovia Bank provided the Beritellis with a loan to purchase lots in the River Rock subdivision even though it knew that this loan posed a high level of long term risk to Wachovia Bank due to the fact these lots were undeveloped and the River Rock subdivision did not have any amenities or the infrastructure to support the amount of money that it was loaning on each of these lots because it was participating in a very competitive lending market and was attempting to maximize the short term financial growth of the bank. [Id. at ¶35]. Wachovia Bank decided to take the risk of making short term loans to the purchasers of lots in River Rock because it believed that the booming real estate market was absorbing hyper inflated sales prices and that in the short term prices would continue to rise, which reduced Wachovia Bank's perception of the risk of such transactions. [Id. at ¶37].

## IV.    ANALYSIS

### A.    Whether Plaintiffs' Claims are Barred by the Applicable Statutes of Limitations

The Bank first argues that because all of the Beritellis' claims are premised on actions or representations that occurred before they purchased the Lot in July 2006, their claims are now time barred.

14

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the allegations of the complaint; significantly, a Rule 12(b)(6) motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Edwards v. City of Goldsboro, 178 F.3d 231, 243-44 (4th Cir. 1999) (quoting Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). As such, "asserting an affirmative defense, like a statute of limitations defense, in a motion to dismiss presents a particular 'procedural stumbling block' for defendants." CSX Transp., Inc. v. Gilkison, 406 F. App'x 723, 728 (4th Cir. 2010) (per curiam) (quoting Fredericksburg & Potomac R.R. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993)). As the Fourth Circuit has explained:

> [A] motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred. But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6). This principle only applies, however, if all facts necessary to the affirmative defense "clearly appear[ ] *on the face of the complaint.*"

Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (quoting Forst, 4 F.3d at 250); see also Johnson v. N.C. Dep't of Transp., 107 N.C. App.

15

63, 67, 418 S.E.2d 700, 702 (1992) (holding that dismissal under Rule 12(b)(6) on the grounds of affirmative defense of statute of limitations is proper "if the complaint on its face reveals an 'insurmountable bar' to recovery") (citation omitted).  "To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised."  CSX Transp., 406 F. App'x at 728-29 (quoting Goodman, 494 F.3d at 466).

In the present case, the Beritellis have asserted four causes of action in their Amended Complaint, namely, claims for fraud, negligent misrepresentation, violations of Chapter 75, and violations of ILSA.  Under North Carolina law, the statute of limitations applicable to fraud and misrepresentation claims is three years.  See N.C. Gen. Stat. § 1-52.  This three-year statute of limitations begins to run "from the discovery of the fraud or from the time it should have been discovered in the exercise of reasonable diligence."  Hunter v. Guardian Life Ins. Co., 162 N.C. App. 477, 485, 593 S.E.2d 595, 601, rev. denied, 358 N.C. 543, 599 S.E.2d 48 (2004) (citation omitted).

Claims under Chapter 75 are subject to a four-year statute of limitations.  See N.C. Gen. Stat. § 75-16.2.  While a Chapter 75 claim generally accrues when the violation of the statute occurs, see Jones v.

16

Asheville Radiological Group, PA, 134 N.C. App. 520, 527, 518 S.E.2d 528, 533 (1999), rev'd in part on other grounds, 351 N.C. 348, 524 S.E.2d 804 (2000), where the claim is based on fraudulent conduct, courts have determined that the cause of action arises at the time that the fraudulent conduct was discovered or should have been discovered with the exercise of due diligence. See, e.g., Faircloth v. Nat'l Home Loan Corp., 313 F.Supp.2d 544, 553-54 (M.D.N.C. 2003), aff'd, 87 F. App'x 314 (2004).

Finally, ILSA claims are subject to a three-year statute of limitations. See 15 U.S.C. § 1711. The accrual date of an ILSA claim, however, depends on the particular type of claim being asserted. For example, for an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C)[6], the statute of

---

[6] Subsections (A)-(C) of § 1703(a)(2) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property:

    (A) to employ any device, scheme, or artifice to defraud;

    (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; [or]

    (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser[.]

15 U.S.C. § 1703(a)(2)(A)-(C).

limitations began to run "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2).  The statute of limitations for an alleged violation of § 1702(a)(2)(D)[7] begins to run three years after the date of signing of the contract of sale.  <u>See</u> 15 U.S.C. § 1711(a)(1).  This limitations period, however, may be subject to equitable tolling if the plaintiffs can demonstrate "(1) that they exercised due diligence to discover their cause of action before the limitations period ran; and (2) that the defendant committed an affirmative act of fraudulent concealment to frustrate discovery despite due diligence."  <u>Orsi v. Kirkwood</u>, 999 F.2d 86, 89 (4th Cir. 1993); <u>Lukenas v. Bryce's Mountain Resorts, Inc.</u>, 538 F.2d 594, 597 (4th Cir. 1976); <u>Dexter v. Lake Creek Corp.</u>, No. 7:10-CV-226-D, 2013 WL 1898381, at *4 (E.D.N.C. May 7, 2013).

Thus, for each of these claims, a determination will have to be made as to when the Beritellis knew or should have known of the alleged fraudulent conduct and statutory violations.  Viewing the factual allegations

---

[7] Section 1703(a)(2)(D) makes it unlawful for a developer or an agent of a developer to make use of any means of interstate communication or transportation, with respect to the sale or lease, or offer to sell or lease, of property, "to represent that roads, sewer, water, gas, or electric service or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed."  15 U.S.C. § 1703(a)(2)(D).

in the light most favorable to the Beritellis, nothing "clearly appears" on the face of the Amended Complaint to show that the Beritellis knew or should have known at the time of the closing in July 2006 of the Bank's alleged wrongful conduct.  See CSX Transp., 406 F. App'x at 729.  Determining the state of the Beritellis' knowledge and the reasonableness of their due diligence are fact-intensive inquiries which would be better resolved at the summary judgment stage or, if necessary, at trial.  See id. at 730.  Accordingly, the Bank's Motion to Dismiss the Beritellis' claims on the basis of the applicable statute of limitations is denied.

## B.    Plausibility of the Plaintiffs' Claims

Next, the Bank contends that the Beritellis' claims are subject to dismissal as they are implausible or otherwise not actionable, in that the Beritellis cannot establish a causal connection between the Bank's alleged conduct and the Beritellis' alleged harm.  In short, the Bank contends that any harm that the Beritellis suffered was the direct result of the fraudulent acts of the developer, acts which deceived not only the lot purchasers but the Bank as well.[8]  In light of the developer's fraudulent conduct, the Bank

---

[8] The Beritellis and other River Rock purchasers brought a separate action against Legasus and others, detailing their allegations of fraud and deception by Legasus.  See Abatemarco, et al. v. Legasus of North Carolina, LLC, et al., No. 1:11-cv-00023-MR (W.D.N.C.).

19

contends, the Beritellis' contention that the Bank willingly accepted long term risk in the pursuit of short term profits is simply implausible.

The Beritellis' claims, however, are sufficiently plausible to survive a motion to dismiss. The Beritellis have alleged that they entered into loan agreements and purchased lots that are now nearly worthless because of the actions of *both* the Bank and Legasus. Specifically, the Beritellis have alleged that the interplay of the rapidly accelerating real estate market, the Bank's emphasis on generating short term revenue in order to benefit its stock price, the Bank's compensation system for its loan officers and directors which incentivized the aggressive marketing of high risk loans, and the Bank's relationship with Legasus as a developer created an environment which encouraged the Bank's employees to make numerous false statements to the Beritellis and other purchasers regarding the quality and value of the River Rock subdivision in order to induce them to enter into loan agreements with the Bank. As this Court explained in a similar case involving counterclaims by River Rock purchasers against Synovus Bank:

> [I]n the present case, the Defendants' allegations, when assumed to be true, establish a plausible reason (*i.e.,* the desire for short-term profitability) for the Bank's willingness to knowingly make under-collateralized loans to the Defendants, even if such

20

loans may have been, as argued by the Bank, contrary to the Bank's long-term financial interests. Further, the Defendants have pled sufficient factual allegations detailing the basis of their claims against the Bank….

As the events of the recent economic crisis have demonstrated, financial institutions do not always make the most prudent business decisions, and they sometimes may accept what would otherwise appear to be unreasonable economic risks for the sake of immediate, short-term profitability. Thus, while the Bank's conduct, as alleged by the Defendants, may not appear to have been the most prudent course of action for the Bank to take in terms of its long-term business interests, that certainly does not mean that such conduct is not plausible as a matter of law. Indeed, as the Magistrate Judge correctly noted, assuming the truth of the Defendants' Counterclaims, "Synovus Bank would not be the first corporation in the history of modern economics to undertake an action that carried substantial risk to its long term financial viability in order to increase short term profits or revenue."

Synovus Bank v. Karp, 887 F.Supp.2d 677, 685-86 (W.D.N.C. 2012)

(internal citation and footnote omitted).[9]

---

[9] The Bank vigorously attempts to distinguish Karp, arguing that the lot purchasers in that case have not asserted claims of fraud against the developer. The Court sees no basis to distinguish Karp on this fact. The Karp Defendants purchased lots in River Rock from Legasus and have asserted claims for fraud against their lender (Synovus Bank) on grounds similar to those asserted by the Plaintiffs in the present case. Whether the lenders in these cases colluded with the developer or were, like the purchasers themselves, victims of the developer's fraud are issues which must be determined as these cases progress. For now, the Court is satisfied that the Plaintiffs' allegations are sufficiently plausible to withstand dismissal at the Rule 12(b)(6) stage.

21

In essence, the Bank's argument appears to be that if the theory of recovery underlying the claim is *unlikely,* the claim is subject to dismissal on the basis of implausibility. Such an argument, however, reads too much into the Iqbal standard. Iqbal does not require the Court to determine the *likelihood* of the facts alleged but rather to determine whether the factual allegations pled in support of that claim are *sufficient* to render the claim *plausible*. For the reasons stated above, the Court finds the Plaintiffs' claims sufficiently plausible to survive a motion to dismiss. See McCauley v. Home Loan Inv. Bank, FSB, 710 F.3d 551, 556 n.5 (4th Cir. 2013) (rejecting argument that purchasers' claim was implausible where purchasers alleged that bank had "incentives to inflate the value of a home because the larger the loan, the larger the proceeds to the lender"). The Bank's motion to dismiss on the grounds of implausibility is denied.

## C. Plaintiffs' Claim for Fraud

In order to state a valid claim for fraud under North Carolina law, a party must allege a false representation or concealment of a material fact that: (1) was reasonably calculated to deceive; (2) was made with the intent to deceive; (3) did in fact deceive the plaintiff; and (4) resulted in damages to the party. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir. 2007). Additionally, the party must demonstrate any reliance on the false

22

representations was reasonable.  See id.  "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate."  Cobb v. Pennsylvania Life Ins. Co., 715 S.E.2d 541, 549 (N.C. Ct. App. 2011).

Here, the Bank seeks dismissal of the Beritellis' fraud claim, arguing that the Amended Complaint fails to state adequate allegations to establish that the Beritellis' reliance on the alleged misrepresentations was reasonable or justifiable.  Specifically, the Bank contends that the Amended Complaint fails to allege specific facts demonstrating their own diligence in investigating the property prior to purchase.  Further, the Bank argues that the allegations of the Amended Complaint indicate that the Beritellis had no contact with Langley until they began the loan application process, which suggests a lack of detrimental reliance.

Contrary to the Bank's arguments, the Beritellis have asserted adequate allegations to establish justifiable reliance.  The Beritellis contend that they could not reasonably have discovered the truth about Langley's misrepresentations [see Amended Complaint, Doc. 85 at ¶122], and it is not clear on the face of the Amended Complaint that the Beritellis' reliance on Langley's statement was not reasonable or justifiable.   Indeed, whether the Beritellis were justified in relying upon Langley's statements is a fact-

23

intensive inquiry which will depend on the development of evidence in the record and in particular the parties' testimony.[10]  In short, this is a matter best resolved on a motion for summary judgment or at trial, not on a motion to dismiss.

The Bank further contends that the Beritellis failed to allege specific facts to demonstrate Langley's intent to deceive.  While fraud claims must be pled with sufficient particularity, allegations regarding the wrongful actor's state of mind – such as malice, intent, and knowledge – may be pled generally.   See Fed. R. Civ. P. 9(b).  Here, the Beritellis have alleged that the Bank, and in particular its employee Langley, acted with the requisite intent to deceive.  [See Amended Complaint, Doc. 85 at ¶120]. Accordingly, the Bank's argument that the element of intent has not been sufficiently pled must be rejected.

The Bank further contends that the Beritellis' fraud claim must be dismissed to the extent that it relies upon mere expressions of opinion of the future value of the property.  "A representation which is nothing more

_____

[10] For example, the Bank repeatedly argues that the Plaintiffs could not have possibly relied to their detriment on Langley's representations because such representations allegedly occurred during the loan application process and thus after the Beritellis had already decided to purchase the property.   The precise timing of Langley's representations and the Beritellis' decision, however, is not entirely clear from the Amended Complaint, and thus this issue is simply not appropriate to resolve at this stage in the litigation.

than an opinion as to the value of property, absent something more, does not constitute actionable fraud." Hall v. T.L. Kemp Jewelry, Inc., 71 N.C. App. 101, 106, 322 S.E.2d 7, 11 (1984). While the Bank discounts the Beritellis' fraud claims as merely relying on statements of opinions expressed by Langley, a review of the Beritellis' allegations reveals that at least some of the misrepresentations alleged were more than mere statements of opinion. For example, the Beritellis allege that Langley told them that the development would have significant amenities and that Legasus had hired "first-rate" contractors, a statement which implies that contractors had been hired and were working on the development. It is alleged, however, that both the Bank and Langley knew at the time that these statements were made that Legasus was not constructing the amenities and infrastructure that it had promised. [Amended Complaint, Doc. 85 at ¶¶5, 60, 80].

Further, Langley represented that Legasus already had reservations for future lot releases, and that the Beritellis could re-sell their lot at one of Legasus's sales event weekends, as lots "always sold out" at these events. Such statement constitutes an implied representation regarding certain past events, namely, that previous sales events resulted in the sale of all of

25

the available lots, a representation which is alleged not to be true. [Id. at ¶77, 78].

Some of the misrepresentations that were alleged to have been made amount to nothing more than statements of opinion by Langley. For example, the Beritellis allege that Langley stated that River Rock was a "hot property," a "great deal," and a "unique investment opportunity." [Id. at ¶75, 77, 80]. Even though such statements are merely expressions of opinion, however, "a statement purporting to be opinion may be the basis for fraud if, at the time it is made, the maker of the statement holds an opinion contrary to the opinion he or she expresses, and the maker also intends to deceive the listener." Leftwitch v. Gaines, 134 N.C. App. 502, 508-09, 521 S.E.2d 717, 723, disc. rev. denied, 351 N.C. 357, 541 S.E.2d 713 (1999). The Beritellis have alleged that Langley intentionally made such false statements with the intent to deceive, thereby implying that Langley did not in fact hold the opinions which he expressed. [See id. at ¶¶118-20]. Thus, even if some of Langley's representations were merely expressions of opinion, the Beritellis have still stated an adequate basis for their fraud claim to survive a Rule 12(b)(6) motion. See Karp, 887 F.Supp.2d at 687-88.

The misrepresentations on which the Beritellis base their fraud claim are admittedly thin. Most of the representations alleged amount to nothing more than statements of opinion or sales "puffery" and would not survive a motion to dismiss absent the plausible allegation that such statements were made with the present intent to deceive and knowledge that such statements were not true or that such opinions were not actually held by the speaker. See id. Because the Plaintiffs' Amended Complaint, construed in the light most favorable to the Plaintiffs, appears to make these necessary additional allegations, it would be inappropriate to dismiss these claims at this time. The Court expresses no opinion, however, regarding whether the Beritellis can produce a sufficient forecast of evidence of the speaker's intent and knowledge at the time the statements were made. That issue would be more appropriately resolved at the summary judgment stage. For now, the Court concludes that although the allegations are weak at best, they are sufficiently pled to withstand the Bank's Rule 12(b)(6) motion.

Finally, the Bank contends that the Beritellis have failed to allege their fraud claim with sufficient particularity. Where a party's allegations sound in fraud, the allegations must satisfy the heightened pleading standards of Rule 9 of the Federal Rules of Civil Procedure. Cozzarelli v. Inspire

Pharmaceuticals Inc., 549 F.3d 618, 629 (4th Cir. 2008).  Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"  Fed. R. Civ. P. 9(b).  Rule 9 applies not only to claims asserting common law fraud, but to all claims where the allegations have the substance of fraud.  Cozzarelli, 549 F.3d at 629.  A claim is subject to dismissal under Rule 12(b)(6) for failure to state a claim if it does not comply with Rule 9(b).  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 n.5 (4th Cir. 1999).

"The standard set forth by Rule 9(b) aims to provide defendants with fair notice of claims against them and the factual ground upon which they are based, forestall frivolous suits, prevent fraud actions in which all the facts are learned only following discovery, and protect defendants' goodwill and reputation."  McCauley, 710 F.3d at 559 (citations omitted).  Accordingly, the Court should be hesitant to dismiss a complaint under Rule 9(b) if the Court is "satisfied (1) that the defendant has been made aware of the particular circumstances for which it will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  Id. (quoting Harrison, 176 F.3d at 784).

Here, a review of the Beritellis' Amended Complaint reveals that the Beritellis have alleged the general time, place and content of each alleged

28

fraudulent statement, while also identifying the person who made each statement and the recipient of each statement. These allegations are sufficient to comport with the requirements of Rule 9(b) and thus to put the Bank on notice of the "particular circumstances for which it will have to prepare a defense at trial." McCauley, 710 F.3d at 559. The Bank's contention that the Beritellis have failed to plead their fraud claim with sufficient particularity is, therefore, rejected.

### D. Plaintiffs' Claim for Negligent Misrepresentation

Next, the Bank seeks dismissal of the Beritellis' claim for negligent misrepresentation, arguing that it owed the Beritellis no duty to assess their investment risk.

A bank owes a borrower only those duties that are specified in the loan agreement. See Camp v. Leonard, 133 N.C. App. 554, 560, 515 S.E.2d 909, 913 (1999) ("a lender is only obligated to perform those duties expressly provided for in the loan agreement to which it is a party"). The Beritellis nevertheless contend that the Bank, through Langley, undertook "a position of special confidence" when Langley elected to make numerous representations to the Beritellis regarding the nature and quality of their investment at River Rock and thus "had a common law duty to be truthful." [Doc. 105 at 10]. The Plaintiffs' argument in this regard, however, is

entirely circular. The Beritellis have not identified any cases construing North Carolina law that recognize an extra-contractual duty arises simply because misrepresentations are made before loan agreements are executed. Indeed, at least one case in which prior representations were apparently made, Branch Banking & Trust Company v. Thompson, did not mention such a distinction. See 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (noting misrepresentation by BB&T officers prior to execution of loan documents but concluding that "[t]he record does not reveal any facts suggesting that the [defendants] reposed any sort of special confidence in BB&T which would serve to give rise to a fiduciary relationship."), disc. rev. denied, 332 N.C. 482, 421 S.E.2d 350 (1992); see also Karp, 887 F.Supp.2d at 690 (dismissing substantially similar claims).

Here, the Beritellis' have made insufficiently plausible allegations of any type of special relationship between them and the Bank beyond that of the typical lender-borrower relationship.[11] Accordingly, the Plaintiffs' negligent misrepresentation claim against the Bank is hereby dismissed.

_____

[11] While the Beritellis allege generally that Langley was a "Certified Financial Planner[ ] who provided investment advice to the Plaintiffs and other purchasers of lots in River Rock" [Amended Complaint, Doc. 85 at ¶66], the Beritellis fail to allege that Langley's conduct in his capacity as a Certified Financial Planner was within the course and scope of his employment with the Bank such that the Bank could be held liable for his actions in that capacity. Further, the Beritellis fail to allege that Langley located, identified or recommended the particular lot, or that the lot purchase was part of a financial plan that

30

## E.    Plaintiffs' Claim for Violations of Chapter 75

The Bank contends that the Beritellis' Chapter 75 claim should be dismissed because North Carolina law does not apply to their claim. Specifically, the Bank argues that under North Carolina choice of law principles, the law of the state where the financial harm occurred should apply. Because the Plaintiffs were residents of New Jersey at the time of the purchase of their lot, the Bank's argument goes, any financial injury that occurred was felt in the Plaintiffs' state of residence, not in North Carolina.[12]

The Court declines to address this choice of law issue at this time. Even if the Court were to determine that North Carolina did not apply, the Court would apply the substantive law of the proper jurisdiction and determine whether the Plaintiffs have stated a claim under that state's relevant consumer protection statute. The Bank, however, does not address whether New Jersey's consumer protection law is applicable in this case or whether the Plaintiffs have stated any claim under that statute, and

---

Langley had devised for them. Thus, no basis in law or fact exists to impose on the Bank the duty to assess the investment risk that the Beritellis were undertaking by purchasing the lot. See Wells Fargo Bank v. Vandorn, No. 11 CVS 6940, 2012 WL 160090, at *2-3 (N.C. Super. Ct. Jan. 17, 2012) (declining to find existence of duty on part of lender to assess borrowers' investment risk because bank had not identified investment opportunity and transaction at issue was not alleged to be part of broader financial plan developed by bank).

[12] Oddly, the Bank does not make a similar argument regarding the Plaintiffs' other tort claims, which are subject to similar choice of law rules.

31

thus the Court is unable to make a determination as to the applicable choice of law.

Further, the record before the Court is insufficiently developed to resolve the choice of law issue at this time. In North Carolina, courts traditionally apply the rule of *lex loci delicti* to tort claims. See Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 853-54 (1988). "For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." Id. at 335, 368 S.E.2d at 854. Similarly, in cases involving claims for unfair or deceptive trade practice, North Carolina courts have applied the law of the state where the injuries were sustained. See ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n.11 (4th Cir. 1983); Lloyd v. Carnation Co., 61 N.C. App. 381, 387-88, 301 S.E.2d 414, 418 (1983); United Va. Bank v. Air-Lift Assoc., Inc., 79 N.C. App. 315, 321, 339 S.E.2d 90, 94 (1986).

In cases involving financial injuries, courts have considered the injury to be sustained "where the economic loss was felt." Clifford v. Am. Int'l Specialty Lines Ins. Co., No. 1:04CV486, 2005 WL 2313907, at *8 (M.D.N.C. Sep. 21, 2005). While the economic loss may be suffered in the state of the plaintiff's residence or principal place of business, courts routinely have rejected applying a bright line rule in determining the situs of

the injury.  See Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 697, 698 S.E.2d 719, 726 (2010), rev. denied, 706 S.E.2d 235 (N.C. 2011) ("[A] significant number of cases exist where a plaintiff has clearly suffered its pecuniary loss in a particular state, irrespective of that plaintiff's residence or principal place of business. In those cases, the lex loci test requires application of the law of the state where the plaintiff has actually suffered harm."); see also United Dominion Indus. Inc. v. Overhead Door Corp., 762 F.Supp. 126, 130 (W.D.N.C. 1991) (noting that in commercial actions, "determining the place that the injury occurred is not especially self-evident").  Following these principles, this Court recently applied North Carolina law to claims asserted by South Carolina residents who bought lots in a North Carolina development, reasoning that the financial injury occurred here because the property was located in North Carolina and the real estate transaction was completed here.  Synovus Bank v. Coleman, 887 F.Supp.2d 659, 669-70 (W.D.N.C. 2012).

In the present case, the record is not sufficiently developed to determine whether North Carolina law is applicable to the Beritellis' claim. While the real estate at issue is located here, it is unclear from the Amended Complaint where the closing occurred.  See United Dominion Indus., 762 F.Supp. at 130-31 (holding that Texas law applied to unfair and

deceptive trade practice claim because closing of sale took place in Texas); United Va. Bank, 79 N.C. App. at 321, 339 S.E.2d at 94 (holding that Virginia law applied where bank's wrongful sale of collateral occurred in Virginia). While the location of the closing itself is not necessary dispositive of the issue, absent those kind of additional facts, the Court cannot make a determination of the choice of law issue at this time. Accordingly, the Bank's motion to dismiss the Chapter 75 claim will be denied. The parties may revisit the choice of law issue at the summary judgment stage, at which time the Court will be in a better position to determine which state law is applicable to the Beritellis' claim.

The Bank further contends that because the Beritellis' Chapter 75 claim is based on the same alleged misrepresentations and omissions that form the basis of their fraud and negligent misrepresentation claims, the Chapter 75 claim should also fail.

To state a claim for unfair and deceptive trade practices under Chapter 75, a party must allege sufficient facts to show "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Spartan Leasing, Inc. v. Pollard, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A deceptive practice is one that

34

has "the capacity or tendency to deceive the average consumer, but proof of actual deception is not required."  Id. at 461, 400 S.E.2d at 482.

To the extent that the Beritellis' Chapter 75 claim is based on negligent misrepresentations that the Court has determined are not plausible claims, these allegations will not be considered.  Because the Court has concluded that the Beritellis have stated a plausible fraud claim with sufficient particularity to survive a motion to dismiss, however, the Court likewise will deny the Bank's Motion to Dismiss with respect to the Chapter 75 claim.  "[P]roof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive acts."  Karp, 887 F.Supp.2d at 688 (quoting Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 97, 331 S.E.2d 677, 681 (1985)).

## F.    Plaintiffs' Claim for Violation of the ILSA

Finally, the Bank seeks dismissal of the Beritellis' ILSA claim on the grounds that the Bank was not a "developer" or an "agent" of a developer in River Rock.

The ILSA "is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers."  Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976).  "The Act also requires

sellers to inform buyers, prior to purchase, of facts which would enable a reasonably prudent individual to make an informed decision about purchasing a piece of real property." Burns v. Duplin Land Dev., Inc., 621 F.Supp.2d 292, 301 (E.D.N.C. 2009).

An individual who purchases a lot may bring a civil action under the ILSA against a "developer or agent" who violates Section 1703(a). 15 U.S.C. § 1709; see also Burns, 621 F.Supp.2d at 301. A "developer" is defined as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. . . ." 15 U.S.C. § 1701(5). An "agent" is defined as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision. . . ." 15 U.S.C. § 1701(6).

Generally speaking, a lending institution acting in the ordinary course of its business is not considered a "developer" within the meaning of the ILSA. See Cumberland Cap. Corp. v. Harris, 621 F.2d 246, 251 (6th Cir. 1980); Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1191-92 (S.D. Cal. 2010) (collecting cases); Hammar v. Cost Control Mktg. and Sales Mgmt. of Va., Inc., 757 F.Supp. 698, 702 (W.D. Va. 1990). "It is only where a financial institution acts beyond its ordinary course of dealing as a lending institution and participates in the actual development, marketing or

36

sale of property that liability may arise under ILSA." <u>Thompson v. Bank of Am.</u>, No. 7:09-CV-89-H, 2011 WL 1253163, at *1 (E.D.N.C. Mar. 30, 2011) (citations omitted).

As the United States District Court for the Western District of Virginia has explained:

> When a financial institution allows its name to be used in advertisements or announcements for a development, it is in effect lending its prestige and good name to the sales effort. It is participating to an acceptable degree in the marketing of the project. It has gone beyond its function as a commercial bank to lot purchasers.

<u>Hammar</u>, 757 F. Supp. at 702-03.

The Fourth Circuit recently reached a similar conclusion, holding that the anti-fraud provision of the ILSA "encompasses entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." <u>In re Total Realty Mgmt., LLC</u>, 706 F.3d 245, 253 (4th Cir. 2013) (finding complaint stated plausible allegations to support ILSA claim where it was alleged that marketer's representatives spoke at developer's sales seminars and disseminated its marketing materials there as well as on the developer's website).

Mindful of the Fourth Circuit's admonition that the ILSA must be construed broadly to effectuate its remedial goals, see <u>Olsen v. Lake Country, Inc.</u>, 955 F.2d 203, 205 (4th Cir. 1991) (per curiam), the Court concludes that the Plaintiffs' Complaint sets forth sufficient plausible allegations to state a claim under the ILSA against the Bank.  The Plaintiffs allege that the Bank, through its employees, participated in sales events with the Developer in June and July 2006 to encourage individuals to buy lots at River Rock; and that the Bank disseminated marketing materials touting its "Wachovia's Development Lot Loan Program" and indicating that the River Rock subdivision was "specifically approved by Wachovia."  [<u>Id.</u> at ¶18].  Further, the Complaint is replete with allegations of statements made by Langley – purportedly at the behest and encouragement of the Bank – promoting the subdivision and otherwise encouraging the Plaintiffs to purchase a lot.  While it remains to be seen whether the Plaintiffs can present a forecast of evidence to support this claim, the Court concludes that the factual allegations of the Complaint are sufficient to state a claim under the ILSA.

## V.  CONCLUSION

**IT IS, THEREFORE ORDERED** that Defendant Wells Fargo Bank, N.A.'s Motion to Dismiss [Doc. 94] is **GRANTED IN PART** and **DENIED IN**

**PART**. Specifically, with respect to the Plaintiffs' claim for negligent misrepresentation, the Motion to Dismiss [Doc. 94] is **GRANTED** and this claim is **DISMISSED**.  In all other respects, the Motion to Dismiss [Doc. 94] is **DENIED**.

      **IT IS SO ORDERED.**

Signed: September 30, 2013

Martin Reidinger
United States District Judge